## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

DONALD J. PASKA         )
                                  )

      Plaintiff,           )
                                  )    **Case No. 07 C 3447**

      v.                )
                                  )    **Magistrate Judge Nan R. Nolan**

MICHAEL J. ASTRUE,      )
Commissioner of Social Security,  )
                                  )

      Defendant.        )

## MEMORANDUM OPINION AND ORDER

Donald Paska appeals from an ALJ's decision denying him social security disability benefits. Because the ALJ failed to adequately address the severity of Mr. Paska's depression, the denial of benefits is reversed and this case is remanded for further proceedings consistent with this Opinion.

## I.    Background

Mr. Paska claims to have become totally disabled on May 14, 2004 because of depression. Mr. Paska was born on April 18, 1961. He alleges a history of depression and substance abuse. Mr. Paska says he never leaves his residence and sleeps and watches television all day. Mr. Paska claims he eats one meal a day and cries a lot. He says he has thoughts of suicide. Mr. Paska dropped out of high school and has not earned a GED. Mr. Paska has worked as a messenger/officer worker for the Board of Trade.

The ALJ applied the familiar five-step analysis used to evaluate disability and found that Mr. Paska had not engaged in substantial gainful activity since May 14, 2004, his alleged onset date (Step One); his affective disorder and history of substance abuse disorder are severe impairments (Step Two); but that his impairments do not qualify as a

listed impairment (Step Three). The ALJ determined that Mr. Paska has no physical/exertional impairments or limitations and retains the mental residual functional capacity to perform unskilled, simple, routine, repetitive work and to interact appropriately with the general public, supervisors, and co-workers on an intermittent basis. Given his RFC, the ALJ found that Mr. Paska is unable to perform his past relevant work as a messenger/officer worker for the Board of Trade (Step Four). The ALJ concluded that there are significant numbers of jobs in the national economy which Mr. Paska can perform: office cleaner (10,000 jobs); assembler (8,000 jobs); and hand-packager (7,000 jobs) (Step Five).

## II.    Discussion

Mr. Paska raises three main arguments and numerous sub-arguments in support of his request for a reversal and remand: (1) the ALJ erroneously failed to accord controlling or significant weight to Dr. Vivar's opinion; (2) the ALJ failed to properly evaluate his mental impairment and failed to properly determine his mental residual functional capacity; and (3) the ALJ made an improper credibility finding that fails to comply with SSR 96-7p and 20 C.F.R. § 404.1529. The Court has considered each of Mr. Paska's arguments and finds several of them to be meritorious.

### A.    ALJ's Evaluation of Dr. Vivar's Opinion

Mr. Paska first argues that "[i]nstead of accepting the opinion of the nontreating, nonexamining DDS physician, the ALJ should have accorded either controlling or significant weight to Plaintiff's treating psychiatrist, Dr. Vivar." Pl's Memo. at 12. A treating physician's opinion is entitled to controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and "not inconsistent with other substantial evidence." Hofslien v. Barnhart, 439 F.3d 375, 376 (7th Cir. 2006). A claimant is not disabled simply

-2-

because his treating physician says so. Dixon v. Massanari, 270 F.3d 1171, 1177 (7th Cir. 2001). "The patient's regular physician may want to do a favor for a friend and client, and so the treating physician may too quickly find disability." Id. (quoting Stephens v. Heckler, 766 F.2d 284, 289 (7th Cir. 1985)). If a treating physician's opinion is not entitled to controlling weight, the ALJ considers several factors in determining the weight to give the opinion, including: the length of the treatment relationship, frequency of examination, nature and extent of the treatment relationship, the degree to which the opinion is supported by medical signs and laboratory findings, the consistency of the opinion with the record as a whole, and whether the opinion was from a specialist. 20 C.F.R. § 404.1527(d)(2)-(5).

Here, Dr. Vivar evaluated Mr. Paska on two occasions for a total of 45 minutes (on 7/14/06 for 30 minutes and on 8/11/06 for 15 minutes ). (R. 131-33). On July 14, 2006, Dr. Vivar conducted a psychiatric assessment and noted no thought disorders, hallucinations or delusions. (R. 133). Dr. Vivar further noted that Mr. Paska's responses were coherent and relevant and he had no homicidal thoughts. Id. Mr. Paska reported having suicidal thoughts, but he was able to contract for safety. Id. Dr. Vivar's diagnosis was dysthymia with superimposed major depression, moderate. Id. Dr. Vivar assessed a Global Assessment Functioning ("GAF") score of 50[1] and gave Mr. Paska a four week supply of 50 mg of Zoloft. Id. On August 11, 2006, Mr. Paska reported that he was still depressed and that the medication was not helping. (R. 131). Dr. Vivar felt Mr. Paska was obsessing

---

[1] A GAF score of 50 applies to an individual with "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition, Text Revision 34 (2000).

about getting Social Security benefits. Id. Dr. Vivar advised Mr. Paska to gradually increase his Zoloft dosage to 200 mg daily. Id.

Mr. Paska does not specify what portion or portions of Dr. Vivar's opinion the ALJ allegedly rejected. The ALJ considered Dr. Vivar's records and discussed Dr. Vivar's findings in detail. The ALJ thoroughly discussed Dr. Vivar's July 14, 2006 psychiatric assessment of Mr. Paska. The ALJ stated:

> [T]reating physician Dr. Zenaida Vivar noted that the claimant's allegations of hearing voices was questionable because most people that hear voices are able to report what the voices are saying to them. In the claimant's case he reported that he could not explain what the voices that he heard were saying to him, and thus, his allegations were questionable. The claimant also alleged that he had a poor appetite, but had no changes in his weight, which was also questionable. He stated that he sleeps for three to four days at a time. The claimant further reported that about four years ago he took an overdose of Xanax, about twenty tablets. He did not know the milligram, but stated that he fell asleep for about two to three days. At that time he stated "it did not feel bad and it was not bad at all. The medication must have [been] weak." He also reported that he seldom went out because he did not like people and did not like to be around people due to anxiety, fear and paranoid feelings that people were out to get him. He then stated that he had been trying to get benefits from the government.

> Dr. Vivar noted that the claimant did not exhibit any thought disorders and there was no evidence of hallucinations or delusions and his responses were coherent and relevant. Dr. Vivar diagnosed the claimant with dysthymia with superimposed major depression, moderate and a Global Assessment Function Score of 50. He was then tried on the medication Zoloft, 50 mg.

(R. 20). The ALJ also discussed Mr. Paska's August 11, 2006 visit with Dr. Vivar. The ALJ noted:

> Subsequent psychiatric progress notes dated August 11, 2006, indicate that the claimant presented reporting that he needed stronger medications because he was still depressed and the prescribed Zoloft medication was not helping him. Dr. Vivar noted that the claimant was obsessing and focusing on applying for Social Security benefits and his lawyer. When he was asked whether he was having any bad thoughts, he replied: "I need to get Social

Security. My lawyer sent all these papers and you have to do this paper work, so that I can get my Social Security." The claimant was then advised to focus on his feelings and symptoms rather than Social Security and his lawyer, and that his paper work would be completed by his case manager. Moreover, Dr. Vivar reported that the claimant was not actively hallucinating, and was not suicidal. Thus, Dr. Vivar kept the claimant on the same Zoloft medication but gradually increased the dosage. Dr. Vivar again noted that the claimant seemed to be interested in getting Social Security disability benefits at that time.

Id. The ALJ further noted:

On August 18, 2006, Dr. Vivar discussed with the claimant's case manager that the forms that had been submitted to his office by the claimant's lawyer in regard to completing an assessment on the claimant's occupational base or job capacity would not be completed because he was not trained to do so, but that he would include all the psychiatric progress notes and psychiatric assessments to the claimant's lawyer.

Id.

The ALJ accepted Dr. Vivar's opinion to the extent that he found Mr. Paska suffers from moderate depression without psychiatric features. The ALJ's conclusion that Mr. Paska has depressive symptoms characterized by symptoms of mild to moderate depression without psychiatric features is not incompatible with Dr. Vivar's diagnosis of dysthymia with superimposed major depression, moderate and his observation of no thought disorders, hallucinations, or delusions. Dr. Vivar did not list any limitations in Mr. Paska's ability to perform work-related activities, and Mr. Paska has not explained how Dr. Vivar's findings conflict with the ALJ's finding that Mr. Paska has the a mental residual functional capacity for unskilled, simple, routine, repetitive work.

Mr. Paska argues that properly crediting Dr. Vivar's opinion would compel a finding that he is unable to work because in the August 16, 2006 treatment plan "Dr. Vivar opined that [Mr. Paska's] major depressive disorder negatively impacts [his] ADLs, his perception

of reality, his ability to interact socially, and his ability to maintain gainful employment." Pl's Memo. at 12. There are two problems with Mr. Paska's argument. As an initial matter, Mr. Paska's suggestion that the two Metropolitan Family Services ("MFS") treatment plans dated August 2006 and February 2007 were completed by Dr. Vivar is not supported by the record. The name of Jan Biscan, LCPC (Licensed Clinical Professional Counselor), not Mr. Paska's treating psychiatrist, is typed on the treatment plans.[2] Neither treatment plan is signed by Dr. Vivar. There is no evidence in the record indicating that Dr. Vivar endorsed the contents of either treatment plan. Second, a counselor is not an "acceptable medical source." 20 C.F.R. § 404.1513(a). The presumption of controlling weight does not apply to counselors. SSR 96-2p (controlling weight given only to opinions from a "treating source" as defined in 20 C.F.R. § 404.1502); 20 C.F.R. § 404.1502 ("Treating source means your own physician, psychologist, or other acceptable medical source who provides you, or have provided you, with medical treatment or evaluation . . . ."). Acceptable medical sources are listed in 20 C.F.R. § 404.1513, and a licensed certified professional counselor is not included in the list.

Mr. Paska faults the ALJ for accepting the opinion of the state's nonexamining consulting psychologist that Mr. Paska's affective disorder does not meet or equal any listing with no evidence of any "marked" or "extreme" limitations assessed. (R. 21). The ALJ properly relied on the state's nonexamining, consulting psychologist's opinion in

---

[2] The record is unclear as to who completed the treatment plans because the signature on the treatment plans is illegible and it does not appear to be that of Jan Biscan. It undisputed, however, that at the very least, the treatment plans were completed by a person who qualifies as an "other source" under the regulations. 20 C.F.R. § 404.1513(d).

reaching her decision. The state's nonexamining, consulting psychologist rendered an opinion that Mr. Paska's affective disorder did not meet or equal a listed impairment. The opinions expressed by Dr. Vivar do not contradict the Psychiatric Review Technique completed by the state agency psychologist. Dr. Vivar did not render an opinion on the question of medical equivalency. Nor did Dr. Vivar make any findings regarding the range of work Mr. Paska could perform. See Steward v. Bowen, 858 F.2d 1295 (7th Cir. 1988) (stating "[t]he reports of Steward's treating physicians simply did not go so far as to render an opinion on the issue in question—medical equivalency. Thus, although neither consulting physician who opined that Steward's impairments do not meet or equal a listed impairment examined her, these opinions were not contradicted by any other evidence in the record. Thus, the consulting physicians' reports did add something of value and were properly considered by the ALJ.").

**B.    Mental Impairment**

Mr. Paska claims that the ALJ improperly evaluated his mental limitations. Mr. Paska contends that the ALJ erred in evaluating his mental impairment by failing to perform the required mental residual functional capacity analysis, including the "special technique" applicable to review of mental impairments.

> The "special technique" assists an adjudicator in evaluating the severity of a claimant's mental impairments. 20 C.F.R. § 404.1520a. The adjudicator evaluates the level of severity of a claimant's mental impairment at steps two and three of the sequential evaluation by rating the claimant's limitations and restrictions in four areas: (1) activities of daily living; (2) social functioning; (3) concentration, persistence, or pace; and (4) episodes of decompensation. 20 C.F.R. § 404.1520a(c)(3). These four functional areas correspond to the requirements of "paragraph B" of the Agency's mental impairment listings. 20 C.F.R. part 404, subpart P, appendix 1, § 12.00 et seq.

Schmidt v. Astrue, 496 F.3d 833, 844 n.4 (7th Cir. 2007).   Contrary to Mr. Paska's

-7-

suggestion, that ALJ addressed the four categories of functional limitation specified in 20 C.F.R. § 404.1520a(c)(3). (R. 20-21). Specifically, the ALJ found Mr. Paska had mild to moderate limitations in his activities of daily living, mild to moderate limitations in social functioning, mild to moderate limitations in maintaining concentration, persistence, and pace, and one episode of decompensation in a work setting. (R. 21).

Mr. Paska argues that the ALJ did not consider his IQ scores of 72 to 76 in combination with his depression as SSR 85-16 requires. On September 6, 2006, Mr. Paska earned a Verbal IQ of 76, a Performance IQ of 73, and a Full Scale IQ of 72. (R. 124). Clinical psychologist Alan W. Jacobs opined that the testing indicated that Mr. Paska was within the low to borderline range of intellectual functioning. (R. 125).

By finding Mr. Paska suffers from depressive symptoms characterized by symptoms of mild to moderate depression without psychiatric features and limiting Mr. Paska to unskilled, simple, routine, repetitive work, the ALJ adequately accounted for Mr. Paska's IQ scores of 72 to 76 in combination with his depression. Unskilled work is "work which needs little or no judgment to do simple duties that can be learned on the job in a short period of time." 20 C.F.R. § 404.1568(a). "The basic mental demands of competitive, remunerative, unskilled work include the abilities (on a sustained basis) to understand, carry out, and remember simple instructions . . . ." SSR 85-15. Dr. Jacobs found that Mr. Paska had no limitations in his abilities to understand, remember, and carry out short, simple instructions despite his intellectual functioning and depression. (R. 126). Clinical psychologist Alan Long confirmed that Mr. Paska appears capable of understanding and remembering instructions. (R. 99). Social Security Ruling 85-16 recognizes that a person with an IQ between 70 and 79 can understand simple oral instructions and would require

less supervision than someone with a lower IQ, and Mr. Paska fails to explain how the ALJ's finding does not comport with SSR 85-16.

Mr. Paska contends that the MFS treatment plans support his claim of a disabling mental impairment and that the ALJ erred by failing to address the MFS treatment plans in her decision. The ALJ may not "select and discuss only that evidence that favors his ultimate conclusion." Herron v. Shalala, 19 F.3d 329, 333 (7th Cir. 1994). "Both the evidence favoring the claimant as well as the evidence favoring the claim's rejection must be examined, since review of the substantiality of evidence takes into account whatever in the record fairly detracts from its weight." Bauzo v. Bowen, 803 F.2d 917, 923 (7th Cir. 1986). The Seventh Circuit has made clear that the "ALJ's decision must be based upon consideration of all the relevant evidence, and that the ALJ 'must articulate at some minimal level his analysis of the evidence.'" Herron, 19 F.3d at 333. Failure to consider an entire line of evidence falls below the minimal level of articulation required. Diaz v. Chater, 55 F.3d 300, 307 (7th Cir. 1995).

The ALJ's failure to mention the MFS treatment plans is fatal to her finding of no disability. In August 2006 and February 2007, Metropolitan Family Services completed treatment plans, which indicated Mr. Paska had GAF scores of 25. The GAF scale measures a "clinician's judgment of the individual's overall level of functioning." Am. Psychiatric Ass'n, Diagnostics and Statistical Manual of Mental Disorders, Fourth Ed., Text Revision 32 (2000). The GAF score is intended to be used in planning treatment, measuring its impact, and in predicting outcome . Id. A GAF score of 21 to 30 indicates that "behavior is considerably influenced by delusions or hallucinations or serious impairment in communication or judgment (e.g., sometimes incoherent, acts grossly

inappropriately, suicidal preoccupation) or inability to function in almost all areas (e.g., stays in bed all day; no job, home, or friends)." Id. at 34. Both MFS treatment plans state that Mr. Paska: (1) has "major depressive disorder which negatively impacts his ability to care for his ADLs, his perception of reality, his ability to interact socially and results in client's increased isolative behavior" and (2) his "symptoms of major depressive disorder negatively impacts [Mr. Paska's] ability to obtain and maintain gainful employment." (R. 136, 139, 140). The February 2007 treatment plan also indicates that Mr. Paska has "symptoms of major depressive disorder negatively impacts his routine self care, i.e. bathing, shaving, wearing clean clothing." (R. 139).

The Commissioner points out that the MFS treatment plans were completed by a non-physician, which is not an acceptable medical source under the regulations. The Commissioner's argument is unpersuasive as justification for the ALJ's failure to mention the MFS treatment plans. First, the ALJ did not state that she rejected the MFS treatment plans because they were completed by a person who was not an acceptable medical source. Post-hoc rationalizations are insufficient to support the ALJ's decisions. Golembiewski v. Barnhart, 322 F.2d 912, 916 (7th Cir. 2003)(stating "general principles of administrative law preclude the Commissioner's lawyers from advancing grounds in support of the agency's decision that were not given by the ALJ."). Second, the MFS treatment plans were completed by a person who at least qualifies as an "other source" under the regulations. The ALJ "may" use evidence from "other sources" to show the severity of [an individual's] impairments and how it affects [an individual's] ability to work." 20 C.F.R. § 404.1513(d). The regulation's use of the word "may" indicates that the ALJ is not required to rely on evidence from other sources or assign it any particular weight, but the ALJ may

not ignore such evidence. SSR 06-03p (stating "[o]pinions from these medical sources, who are not technically deemed 'acceptable medical sources' under our rules, are important and should be evaluated on key issues such as impairment severity and functional effects, along with the other relevant evidence in the file.").

ALJ Martin did not mention, discuss, or explain why she was ignoring the MFS treatment plans or the GAF scores of 25. While a GAF score standing alone may not be determinative of disability, it is a relevant piece of evidence to be considered along with the rest of the record. Howard v. Commissioner of Social Security, 276 F.3d 235, 241 (6th Cir. 2002) (holding that "ALJ's failure to reference the GAF score in the RFC, standing alone, does not make the RFC inaccurate."). Moreover, the ALJ may not pick and chose portions of the medical record which support the ALJ's denial of benefits. The ALJ explicitly considered only Mr. Paska's higher GAF score of 50 (R. 20), ignoring the lowest scores of 25 and the ones most suggestive of disability. Because the ALJ's decision does not mention the two MFS treatment plans and the GAF scores of 25, it is unclear whether the ALJ considered this aspect of the record. The MFS treatment plans and the GAF scores of 25 are significant lines of evidence concerning the seriousness of Mr. Paska's mental status and they should have been addressed and analyzed by the ALJ. Indoranto v. Barnhart, 374 F.3d 470, 474 (7th Cir. 2004) (stating that "[a]lthough the ALJ need not discuss every piece of evidence in the record, he must confront the evidence that does not support his conclusion and explain why it was rejected."). On remand, the Commissioner is directed to reconsider the evidence of Mr. Paska's mental impairment and to include an evaluation and discussion of the MFS treatment plans and the GAF scores of 25.

The ALJ's finding that Mr. Paska has only mild to moderate limitations in his activities of daily living is not supported by substantial evidence. When measuring limitations imposed by mental impairments:

> Activities of daily living include adaptive activities such as cleaning, shopping, cooking, taking pubic transportation, paying bills, maintaining a residence, caring appropriately for your grooming and hygiene, using telephones and directories, and using a post office. In the context of your overall situation, we assess the quality of these activities by their independence, appropriateness, effectiveness, and sustainability. We will determine the extent to which you are capable of initiating and participating in activities independent of supervision or direction.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(C)(1). The state agency psychologist opined that Mr. Paska had only mild restrictions of activities of daily living, and the ALJ properly relied on his opinion in determining medical equivalence. (R. 21; 110); Scheck v. Barnhart, 357 F.3d 697, 700 (7th Cir. 2004).

The other reasons given by the ALJ for rejecting Mr. Paska's statements regarding the extent of his daily activities are not sufficient and warrant reversal.[3] The ALJ stated:

> Although the claimant reported that he does not perform any household chores and sits around watching television all day, the record shows that he is persistently pursing his application for disability benefits and appears to be able to get out an about to the various sources in order that information is provided to complete his claim. He has also reported that he has gone from one friend to another for shelter and meals.

(R. 21). The ALJ did not explain why she thought these activities were inconsistent with

---

[3] The Commissioner's reliance on the medical expert's opinion that Mr. Paska had only mild to moderate limitations in activities of daily living as support for the ALJ's finding is unpersuasive because the ALJ did not include such a reason in her decision. Def's Brief at 12; Golembiewski, 322 F.3d at 916.

greater limitations in Mr. Paska's activities of daily living. In defense of the ALJ's credibility finding, the Commssioner says that the ALJ considered Mr. Paska's ability to pursue his diability benefits application and to go to various sources in order to see that information is provided to complete his claim as evidence that contradicted Ms. Paska's claim that he rarely left the house. In fact, the record shows only limited, sporadic appointments which are not inconsistent with Mr. Paska's claim that he "seldom goes out" or his claim of a disabling mental impairment. (R. 132).

Over the period between March 2005 and February 2007, Mr. Paska attended eight appointments related to his claim for disability: (1) Dr. Long - 3/2/05 (R. 95); (2) Oak Forest Hospital Emergency Room - 5/23/06 (R. 114); (3) Dr. Vivar - 7/14/06 (R. 132); (4) 7/18/06 ALJ Hearing (R. 144); (5) Dr. Vivar - 8/11/06 (R. 131); (6) Metropolitan Family Services - 8/16/06 (R. 136); (7) Dr. Jacobs - 9/6/06 (R. 124); and (8) Metropolitan Family Services - 2/16/07 (R. 139). The Court does not see how being able to attend eight appointments over an almost two year period is inconsistent with a disabling mental impairment. "Disability does not mean that a claimant must vegetate in a dark room excluded from all forms of human and social activity." Smith v. Califano, 637 F.2d 968, 971 (3rd Cir. 1981). Indeed, the lack of medical treatment is consistent with depression, "a notoriously underreported disease." Wilder v. Apfel, 153 F.3d 799, 802 (7th Cir. 1998); Nguyen v. Chater, 100 F.3d 1462, 1465 (9th Cir. 1996) (noting "it is common knowledge that depression is one of the most underreported illnesses in the country because those afflicted often do not recognize that their condition reflects a potentially serious mental illness."). Mr. Paska's treatment activities and other appointments in pursuit of his claim for benefits are minimal, and it is well established that minimal or sporadic activity does not disprove disability. See Clifford

v. Apfel, 227 F.3d 863, 872 (7th Cir. 2000) (noting "minimal daily activities . . . do not establish that a person is capable of engaging in substantial physical activity."); see also Carradine v. Barnhart, 360 F.3d 751, 755 (7th Cir. 2004) (stating the ALJ "failed to consider the difference between a person's being able to engage in sporadic physical activities and her being able to work eight hours a day five consecutive days of the week."). The ALJ should have explained the inconsistencies between Mr. Paska's attendance at limited, sporadic appointments and his claim of a disabling mental impairment.

The ALJ also improperly discounted Mr. Paska's account of his daily activities based on the fact that he has places to stay because he has "mooched" off of his friends for two years. (R. 125). It is hard to see how seeking shelter and food from friends in order to avoid going homeless or hungry contradicts Mr. Paska's description of his daily activities. Again, the ALJ did not explain the inconsistencies she perceived between staying with friends for a two year period and Mr. Paska's claim of more than mild to moderate restrictions in daily activities. Having generous and indulgent friends does not imply the mental capacity to work on a sustained and continuous basis.[4] Moreover, the MFS treatment plans which the ALJ improperly ignored indicate that Mr. Paska's major depressive disorder negatively impacts his ability to care for his activities of daily living. (R. 136, 139). For these reasons, the ALJ's finding that Mr. Paska is only mild to moderately limited in his activities of daily living is not supported by substantial evidence.

_____

[4] While noting that it was not "specifically considered by the ALJ," the Commissioner points out that the "record also contained statements from Plaintiff's mother that he could prepare his own meals daily, do house and yard work without encouragement, and use public transportation without assistance." Def's Brief at 12. The ALJ did not rely on Mr. Paska's mother's statements, and the Commissioner's post-hoc rationalization cannot be considered. Golembiewski, 322 F.2d at 916.

With respect to Mr. Paska's social functioning, the ALJ found that Mr. Paska had mild to moderate limitations in social functioning because he "has friends and keeps in touch with his mother," "attends doctors' appointments and is actively seeking psychiatrist treatment although it is questionable whether it is in order to pursue disability benefits" (R. 21). Again, the ALJ's articulated reasons are unconvincing and do not build an "accurate and logical bridge between the evidence and the result." Clifford, 227 F.3d at 872.[5]

The ALJ's finding that Mr. Paska had only mild to moderate limitations in social functioning is inconsistent with substantial evidence in the record. The fact that Mr. Paska has relied on a few friends for shelter and food and has maintained telephone contact with his elderly mother does not support the ALJ's conclusion that he is only mild to moderately limited in social functioning and does not undermine the applicability of Listing 12.04. Mr. Paska testified that he was living with a friend, but denied participating in social activities. (R. 147, 157); see also (R. 125). Mr. Paska told Dr. Jacobs that he has had places to stay for the past two years because he has been "mooching off [his] friends." (R. 125). Mr. Paska denied any other friendships or participating in any social activities. Id. Mr. Paska keeps in telephone contact with his elderly mother who lives in a nursing home. (R. 83, 163). There is no evidence that he visits or gets together with friends, engages in any social situations or participates in any group activities. There is evidence that he has problems interacting with others. Mr. Paska stated that he did not get along with the people he previously worked with. (R. 98, 150-51). Dr. Long confirmed that Mr. Paska may have

[5] The Commissioner again inappropriately attempts to rely on the medical expert's opinion as support for the ALJ's finding that Mr. Paska has only mild to moderate limitations in the area of social functioning, where the ALJ did not rely on or make reference to that fact in her decision. Def's Brief at 13; Golembiewski, 322 F.3d at 916.

some problems with supervision and co-workers based on his history. (R. 99). Even the GAF score of 50 assessed by Dr. Vivar, which the ALJ noted in her decision, indicates serious symptoms or a serious impairment in social or occupational functioning.

It is additionally unclear how the ability to attend limited doctor's appointments and seek minimal psychiatric treatment sheds any light on Mr. Paska's ability to function socially. Social functioning refers to the ability to "interact independently, appropriately, effectively, and on a sustained basis with other individuals." 20 C.F.R. Pt. 404, Subpt. P., App. 1, § 12.00(C)(2). Attending doctor's appointments is not a particularly social function and is not inconsistent with more than mild to moderate limitations in the ability to function socially. The Court does not see how the ability to attend limited doctor's appointments, even if in order to purse disability benefits, establishes that a person is capable of forming and maintaining relationships with others. The ALJ did not offer any explanation of how an ability to attend limited doctor's appointments and pursue disability benefits demonstrates anything about the nature and overall degree of social functioning ability. Additionally, the MFS treatment plans which the ALJ failed to mention state that Mr. Paska's major depressive disorder negatively impacts his ability to interact socially and results in increased isolative behaviors.[6]

---

[6] As a general matter, the Court is troubled by the ALJ's finding that Mr. Paska's ability to seek limited treatment for his mental illness is somehow incompatible with the applicability of Listing 12.04. Jones v. Apfel, 997 F.Supp. 1085, 1092 n.16 (N.D. Ind. 1997) (finding "ill-founded" the ALJ's use of claimant's ability to seek treatment for her depression to support his finding that she was not mentally disabled). "Fewer people would actually seek treatment if the very fact of obtaining mental health treatment becomes a basis for a finding of not disabled." Id. The Court doubts that the pursuit of medical treatment should be a relevant factor in discrediting a claim of a disabling mental impairment.

The Court agrees with Mr. Paska that the Commissioner's reliance on Hogg v. Sullivan, 987 F.2d 328, 333 (6th Cir. 1993), is misplaced. In Hogg, the Sixth Circuit found the claimant did not experience marked difficulties in social functioning because she attended church, visited relatives, and her treating physician reported on several occasions that she related well toward others. Mr. Paska's social acitivites are much more limited and there is no evidence he relates well toward others. There is also no evidence Mr. Paska engages in any group activities. The record here demonstrates only that Mr. Paska has relied on others for shelter and keeps in touch with his mother by telephone.

Mr. Paska argues that the ALJ should have found greater limitations in his ability to maintain concentration, persistence, or pace. The ALJ found Mr. Paska mild to moderately limited in his ability to maintain concentration, persistence, and pace but capable of performing unskilled, simple, routine, repetitive work. (R. 21). The ALJ stated that "[p]sychiatric evaluations have indicated that the claimant has no significant problems in the ability to concentrate, and that he has no psychiatric features." (R. 21). Substantial evidence supports the ALJ's finding in this respect. The ALJ found that Mr. Paska had greater limitations in his ability to maintain concentration, persistence, and pace as a result of his mental impairment than the state agency psychologist, who opined that Mr. Paska had no difficulties in maintaining concentration, persistence, or pace. (R. 110). The ALJ's finding is supported by other evidence in the record, including Dr. Jacobs' opinion that Mr. Paska had no limitations in his ability to understand, remember, and carry out short, simple instructions and Dr. Long's finding that Mr. Paska is capable of understanding and remembering instructions. (R. 99, 126). Mr. Paska points out that Dr. Jacobs found him slightly limited in his ability to make judgments on simple work-related decisions and

-17-

moderately limited in the abilities to respond appropriately to work pressures in a usual work setting and changes in a routine work setting. (R. 127). These findings by Dr. Jacobs do not contradict the ALJ's finding of mild to moderate limitations in concentration, persistence, and pace because even a moderate restriction in these areas indicates that the "individual is still able to function satisfactorily." (R. 126).

Mr. Paska further challenges the ALJ's finding of one episode of decompensation when Mr. Paska presented to the emergency room reporting that he had been depressed for two years. (R. 21). Mr. Paska argues that the ALJ should have found that he had two episodes of decompensation due to his depression based on the medical expert's testimony at the hearing. Pl's Brief at 11-12. The ALJ's finding is supported by the state agency psychologist's finding of no episodes of decompensation. Even accepting Mr. Paska's argument that the ALJ should have found two episodes of decompensation, it makes no difference to the outcome of the case whether the ALJ found one or two episodes of decompensation. Only four or more episodes of decompensation represent a degree of limitation that is incompatible with the ability to do any gainful activity. 20 C.F.R. § 404.1520a(c)(4). Also, one and two episodes of decompensation are both in the second point of the four-point "B" criteria scale. Id.

Mr. Paska next argues that the ALJ erred in failing to recontact the medical expert who testified at the administrative hearing to obtain his opinion about Dr. Jacobs' evaluation. The ALJ was not required to forward the new evidence to the ME for review. The HALLEX provision relied on by Mr. Paska states only that an ALJ *may* decide to request the medical expert to review new evidence subsequent to the hearing. "When an ALJ receives new

evidence after an ME has provided testimony or responded to interrogatories, the ALJ may decide to request the ME to review the new evidence to determine if it affects the ME's testimony or response." HALLEX I-2-5-45; see also HALLEX I-2-5-40 (recognizing that "relatively infrequently" it will occur that "the ALJ may identify the need for ME evidence . . . after the hearing . . . .").

Although an ALJ has a duty to fully develop the record before drawing any conclusions, ALJ Martin did not inadequately develop the record by failing to recontact the ME. Murphy v. Astrue, 496 F.3d 630, 634 (7th Cir. 2007). An ALJ is only required to consult a medical source, including a medical expert, when the evidence from that source is inadequate to determine whether the claimant is disabled. 20 C.F.R. § 404.1512(e). Mr. Paska does not point to any issue raised by the post-hearing evidence which required medical expert testimony. The post-hearing evidence fulfilled the need identified by the medical expert of another consultative examination and did not itself need further clarification. The ALJ's RFC finding accounted for the post-hearing evidence. After the administrative hearing, Mr. Paska took an IQ test administered by Dr. Jacobs and received a 76 verbal, 73 performance, and 72 full scale IQ, which is considered within the low borderline range of intellectual functioning. (R. 124). With respect to Mr. Paska's ability to understand, remember, and carry out instructions, Dr. Jacobs found, in relevant part, that Mr. Paska had no limitations in his ability to understand, remember, and carry out short, simple instructions. (R. 126). The ALJ accommodated Mr. Paska's intellectual functioning level by limiting him to unskilled, simple, routine, repetitive work.[7] With respect to Mr.

---

[7] By definition, "unskilled work" is "work which needs little or no judgment to do simple duties that can be learned on the job in a short period of time." 20 C.F.R. §

Paska's ability to respond appropriately to supervision, co-workers, and work pressures in a work setting, Dr. Jacobs found Mr. Paska slightly limited in his ability to interact appropriately with the public, moderately limited in his ability to interact appropriately with supervisor(s) and slightly limited in his ability to interact appropriately with co-workers. (R. 127). The ALJ adequately accounted for Dr. Jacobs' finding regarding Mr. Paska's ability to respond appropriately to supervisors, co-workers, and work pressures by limiting Mr. Paska's interaction with general public, supervisors, and co-workers to an intermittent basis. (R. 21). The record as a whole contained an adequate picture of Mr. Paska's condition. The record included, among other things, Mr. Paska's treating psychiatrist's psychiatric assessment, the reports of two consulting physicians, and a state agency psychologist's Psychiatric Review Technique. The ALJ's failure to have the medical expert review Dr. Jacobs' report and the IQ test results does not warrant reversal.

Mr. Paska speculates that the medical expert's review of Dr. Jacob's findings, especially Mr. Paska's IQ of 72, might have resulted in a finding of a greater limitation in the area of maintaining concentration, persistence, and pace. "Concentration, persistence, or pace refers to the ability to sustain focused attention and concentration sufficiently long to permit the timely and appropriate completion of tasks commonly found in work settings." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(C)(3). Again, a person with an IQ between 70 and 79 can understand simple oral instructions and be able to carry out these instructions with less supervision than someone with a lower IQ. SSR 85-16. Dr. Jacobs found Mr. Paska able to understand, remember, and carry out short, simple instructions. (R. 126).

---

404.1568(a).

Dr. Paska's findings that Mr. Paska had no limitations in his ability to understand, remember, and carry out short, simple instructions despite his IQ of 72 adequately accounted for Mr. Paska's ability to appropriately complete tasks. There is no reason to conclude that the medical expert would have found Mr. Paska unable to perform unskilled, simple, routine, repetitive work even with an IQ of 72.

Williams v. Manssanari, 171 F.Supp.2d 829 (N.D. Ill. 2001), cited by Mr. Paska, does not compel a different finding. In Williams, medical records and evidence from claimant's primary treating physician were missing from the record at the time of the hearing. Id. at 833. At the hearing, the ALJ told the medical expert (ME) that "ideally it would be good to have them now for *you to evaluate.*" Id. The ALJ proceeded with the hearing, and the ME testified based upon the incomplete record. Id. The ALJ then held the record open to obtain medical records from claimant's treating physician and hospitals. Claimant's counsel requested that the ALJ forward the additional records to the ME. Id. After the ALJ's receipt of the records, the ALJ did not forward the records to the ME. The ALJ relied on the ME's opinion in determining the claimant's RFC. The magistrate judge held that the ALJ "incorrectly and unfairly relied on an incomplete ME opinion." Id.

In this case, ALJ Martin accepted the ME's suggestion of a second consultative examination. The ME did not state that he wished to review the additional consultative examination, and Mr. Paska's counsel did not request that the medical expert review the results of this examination. See Hawkins v. Barnhart, 2003 WL 1717076, at *15 (N.D. Ill. March 31, 2003) (stating that "[i]f plaintiff's counsel deemed the MRI study to be worthy of further expert analysis, she should have so advised the ALJ."). Unlike the ALJ in Williams,

ALJ Martin did not rely on the ME's testimony in making her RFC findings.

In his reply, Mr. Paska argues that the ALJ erred when she relied on post-hearing evidence but failed to offer him a supplemental hearing as required by HALLEX I-2-7-30. See also Tom v. Heckler, 779 F.2d 1250, 1252 n.2 (7th Cir. 1985) (holding that "[t]he use of an adverse post-hearing vocational report without an opportunity to cross-examine its author and to present rebuttal evidence has been held to violate a claimant's right to due process of law."). Mr. Paska's argument is without merit. A "proffer letter" notifying Mr. Paska's counsel that, among other things, he had could "request a supplemental hearing at which [he] would have the opportunity to appear, testify, produce witnesses, and submit additional evidence and written or oral statements concerning the facts and law" is contained in the record at pages 24 and 25.

Mr. Paska unpersuasively argues that the ALJ impermissibly "played doctor" when she "interpreted the post-hearing records without the assistance or opinion of the ME." Pl's brief at 17. While "ALJs must not succumb to the temptation to play doctor and make their own independent medical findings," this is not what happened here. Rohan v. Chater, 98 F.3d 966, 970 (7th Cir. 1996). ALJ Martin did not play doctor by interpreting the IQ test results on her own or by reaching medical conclusions. Rather, it was Dr. Jacobs who interpreted the IQ test results by opining that Mr. Paska was within the low borderline range of intellectual functioning. (R. 125). Given his level of intellectual functioning, Dr. Jacobs further opined that Mr. Paska had no restrictions on his ability to understand, remember, and carry out short, simple instructions, was slightly restrictions on his ability to interact appropriately with the public and co-workers, and was moderately limited in his ability to

interact appropriately with supervisors. (R. 126-27). The ALJ merely relied on Dr. Jacobs' findings in making her RFC findings, and her RFC finding is consistent with Dr. Jacobs' opinion.

Mr. Paska challenges the ALJ's finding that "it appears that [Mr. Paska] is malingering his symptoms in order to pursue disability benefits, as implied by treating psychiatrist Dr. Vivar in his psychiatric progress notes dated August 2006 " as improperly "playing doctor." (R. 21). The ALJ additionally noted that Dr. Vivar assessed Mr. Paska to lack motivation to perform work activity. Id. The ALJ's finding is supported by substantial evidence. Mr. Paska is correct that the ALJ confused Dr. Vivar's report with that of Dr. Long, the consultative examiner who observed that Mr. Paska "does not seem motivated to work," when she noted that Dr. Vivar assessed Mr. Paska to lack motivation to work. (R. 99). The ALJ's mistaken reference to Dr. Vivar instead of Dr. Long did not lead to an incorrect analysis. Dr. Vivar's reports do not support Mr. Paska's claim of disability. Dr. Vivar characterized Mr. Paska as "obsessing and focusing so much on Social Security and his lawyer." (R. 131). Dr. Vivar further noted that when he asked Mr. Paska if he was having bad thoughts, Mr. Paska responded: "I need to get Social Security. My lawyer sent me all these papers and you have to do all this paper work, so that I can get my Social Security." Id. Dr. Vivar concluded that Mr. Paska "seemed [] interested so much on getting Social Security Disability at this time." Id. ALJ Martin reasonably concluded from Dr. Vivar's statements regarding Mr. Paska's preoccupation with obtaining disability benefits that Dr. Vivar was implying that Mr. Paska was malingering.

-23-

Mr. Paska next challenges the ALJ's hypothetical question to the vocational expert. Mr. Paska's challenge to the hypothetical is two-fold. He argues: (1) the hypothetical contained an improper vocational conclusion by expressing Mr. Paska's mental residual functional capacity as retaining the ability to do simple, repetitive, routine, unskilled work with minimal contact with supervisors, co-workers, and the public; and (2) the hypothetical failed to include all of his mental limitations supported by the record.

As to the first argument, the Seventh Circuit has held that a hypothetical question for "simple, routine, repetitive, low stress work with limited contact with coworkers and limited contact with the public" "was flawed in that it purported to tell the vocational expert what types of work [the claimant] could perform rather than setting forth [the claimant's] limitations and allowing the expert to conclude on his own what types of work [the claimant's] could perform." Young v. Barnhart, 362 F.3d 995, 1004 n. 4 (7th Cir. 2004). The Seventh Circuit declined to decide whether the error by itself was harmless because it found that the hypothetical was fatally flawed for other reasons. Id.

In another Seventh Circuit case, the ALJ's hypothetical to the VE included the mental ability to perform "repetitive, low-stress" work. Johansen v. Barnhart, 314 F.3d 283, 289 (7th Cir. 2002). The limitation of low-stress, repetitive work was based on a medical expert's translation of the ALJ's finding that Johansen was moderately limited in his ability to maintain a regular schedule and attendance and in his ability to compete a normal workday and workweek without interruptions from psychologically-based symptoms into a specific RFC assessment that Johansen could still perform low-stress, repetitive work. Id. The Seventh Circuit found that the ALJ reasonably relied on the medical expert's opinion in

formulating the hypothetical. Id; see also Delaney v. Barnhart, 2005 WL 1655204, at * 11-12 (N.D. Ill. May 13, 2005) (holding ALJ did not make improper vocational conclusion by including limitation of simple, routine tasks rather than medical findings listed in PRTF (Psychiatric Review Technique Form) and MRFC (Mental Residual Functional Capacity) in hypothetical because two medical experts concluded, based on claimant's PRTF and MRFC that claimant was limited to simple, routine tasks and ALJ relied on this medical limitation in making his medical findings).

This case is distinguishable from Johansen in an important respect. Here, Mr. Paska appears to argue that the hypothetical question to the vocational expert should have included the ALJ's "B" criteria functional limitation determinations (mild to moderately limited in regard to restrictions of daily activities, maintaining social functioning, maintaining concentration, persistence and pace, and having had one episode of decompensation) rather than the ALJ's finding of simple, repetitive, routine, unskilled work with minimal contact with supervisors, co-workers, and the public. The medical expert agreed with the ALJ's translation of the ME's findings on the "B" criteria to a specific residual functional capacity of "unskilled, simple, routine, repetitive type work, minimal contact with supervisors, co-workers, and the public." (R. 172-73). The ME's testimony might have supplied by the missing bridge between the evidence and the ALJ's conclusion, but unlike the ALJ in Johansen, ALJ Martin did not rely on the medical expert's opinion in making her RFC determination and then in formulating her hypothetical. The ALJ's mentioned the medical expert's testimony only to note her disagreement with the medical expert's opinion that "there was a lack of evidence to determine[] whether the claimant was disabled." (R. 21). Instead, the ALJ relied upon the opinion of the state agency psychologist, who did not

translate the "B" criteria limitations he found into a specific RFC. Id; (R. 100-13). None of the other treating or consulting physicians' translated the "B" criteria limitations into a specific RFC assessment. Because the ALJ did not rely on any medical report or opinion for her conclusion that Mr. Paska was capable of unskilled, simple, routine, repetitive type work with minimal contact with supervisors, co-workers, and the public encompassed the "B" criteria limitations determination, the hypothetical was flawed. Young, 362 F.3d at 1004 n.4; Johansen, 314 F.3d at 290. As in Young, it need not be decided whether this error by itself was harmless because this case is being remanded for other reasons. Young, 362 F.3d at 1004 n.4

Next is the question of whether the hypothetical included all of the limitations supported by the record. Mr. Paska contends that the ALJ erred in failing to include his poor hygiene, difficulty with stress, anger problems, and his unexpected crying in the hypothetical that the ALJ posed to the VE. A hypothetical question "must fully set forth the claimant's impairments to the extent that they are supported by the medical evidence in the record." Herron, 19 F.3d at 337. Mr. Paska argues that the ALJ failed to include these limitations because she failed to adequately consider the MFS treatment plans. This is similar to Mr. Paska's argument that the ALJ should have deferred to the MFS treatment plans in formulating his RFC. Whether the hypothetical is improper on this basis depends on whether the ALJ finds the limitations contained in the MFS treatment plans to be supported by the record. This case is being remanded for the ALJ to consider and articulate her consideration of the MFS treatment plans. If on remand the ALJ's consideration of the MFS treatment plans alters her RFC findings, then the ALJ shall propound new hypothetical question(s) which incorporate all of Mr. Paska's limitations supported by the record.

Mr. Paska contends that the ALJ's finding that he is capable of performing work as an office cleaner, assembler, and handpackager is not supported by substantial evidence. Mr. Paska argues that his IQ of 72 limits the number of jobs he can perform. Mrs. Paska says he is unable to perform the position of Cleaner, Industrial (DOT #381.687-018) and hand packager (DOT #920.587-018) because they require a reasoning level of 2. A reasoning level of 2 requires a person to apply commonsense understanding to carry out detailed but uninvolved written or oral instructions and to deal with problems involving a few concrete variables in or from standardized situations.

The ALJ's reliance upon testimony of the vocational expert (VE) in this respect was not erroneous. The ALJ complied with her duty to ask the VE whether the evidence he provided was consistent with information provided in the Dictionary of Occupational Titles (DOT). (R. 179); Prochaska v. Barnhart, 454 F.3d 731, 735 (7th Cir. 2006). Mr. Paska has not demonstrated that enough of the VE's analysis conflicts with the DOT. As the Commissioner points out, the office cleaner position cited by the VE (DOT #381.687-014) requires a reasoning level of only one. (R. 179) (noting there are 10,000 office cleaner jobs in the Chicago Metropolitan area). A reasoning level of one requires an individual to apply commonsense understanding to carry out simple one- or two-step instructions and to deal with standardized situations with occasional or no variables in or from these situations encountered on the job. Mr. Paska does not contend that he cannot perform work with a reasoning level of one. That the VE's testimony regarding assembler and hand packager positions may conflict in some respects with the DOT did not affect the outcome because ten thousand office cleaner jobs in the Chicago metropolitan area is a significant number of jobs. Lee v. Sullivan, 988 F.2d 789, 794 (7th Cir. 1993) (1,400 jobs are a significant

-27-

number); McCloseky v. Apfel, 1998 WL 473056, at *6 (N.D. Ill. 1998) (holding 3,500 customer-service clerk jobs in the Chicago metropolitan area was a significant number of jobs).

## C.    Credibility

The ALJ found that Mr. Paska's statements concerning the intensity, persistence and limiting effects of his symptoms were not entirely credible. (R. 21).  The ALJ based his credibility assessment, in part, on the fact that "current psychiatric evaluations indicate that his depression is not as severe as he alleges."  Id.  Mr. Paska argues that the ALJ's credibility finding is not supported by substantial evidence in part because the ALJ failed to credit his GAF scores of 25.  The ALJ erred in failing to examine the MFS treatment plans and the GAF scores of 25  as part of her credibility analysis.  On remand, the ALJ shall reevaluate Mr. Paska's credibility in accordance with the treatment plans and GAF scores of 25.  Moreover, as previously discussed, the fact that Mr. Paska has relied on others for shelter, attended limited, scheduled appointments, and maintains telephone contact with his mother does not undermine his allegations of a disabling mental impairment.

## III.    Conclusion

The above described errors warrant a remand for the ALJ to reevaluate Mr. Paska's mental impairment at Step 3, redetermine Mr. Paska's RFC, reevaluate Mr. Paska's credibility and conduct a new Step 5 analysis.  Plaintiff Donald Paska's Motion for Summary Judgment or Remand [20] is granted in part and denied in part.  Defendant Commissioner of Social Security's Motion for Summary Judgment [27-2] is granted in part and denied in part.  Pursuant to sentence four of 42 U.S.C. § 405(g), the ALJ's decision is reversed, and

this case is remanded to the Administration for further proceedings consistent with this Opinion. The Clerk is directed to enter final judgment in favor of the Plaintiff and against the Defendant in accordance with Rule 58 of the Federal Rules of Civil Procedure.

ENTER:

Nan R. Nolan
United States Magistrate Judge

Dated: February 6, 2008